IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DONNA HOOVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:11cv1022-SRW |
| | ) | |
| CATHLEEN FREEMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

This action is before the undersigned Magistrate Judge by written consent of all

parties, pursuant to 28 U.S.C. § 636(c).  (See Doc. ## 18, 19).  Plaintiff Donna Hoover sues

defendants Cathleen Freeman, Shannon Chambers and Steve McClendon[1] – in their

individual capacities only – pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth

Amendments.  She alleges that each defendant is "an agent, employee, jailer or officer for

the Russell County Sheriff" and claims that each is liable to her for personally subjecting her

to excessive force and for failing to prevent the other defendants from doing the same after

the officer who arrested plaintiff for DUI on November 14, 2010, brought her to the Russell

County jail.  (Doc. # 1).  This action is presently before the court on the motion for summary

judgment filed by defendants on June 3, 2013 (Doc. # 41).  By order entered on June 4, 2013,

---

[1]  The defendants identified in the complaint as Cathleen Freeman and Steve McClendon state that their correct names are Kathleen Freeman and James McLendon.  (Doc. # 41, p. 1 n. 1; see also Defendants' Exhibits F (Freeman affidavit) and H (McLendon unsworn statement) and Doc. # 46-1 (McLendon affidavit)).  The court will direct amendment of the docket to identify defendants by their correct names.

the court advised plaintiff regarding summary judgment procedure and allowed her an opportunity to file a response to the motion  (Doc. # 45); however, plaintiff has failed to do so. Upon consideration of defendants' motion, the court concludes that it is due to be granted.

## SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir.2010).  "Federal Rule of Civil Procedure 56 requires a party asserting that a fact is genuinely disputed to support his assertion by citing to specific materials in the record, and a failure to do so allows the district court to consider the facts as undisputed for purposes of the motion for summary judgment." Williams v. Slack, 438 Fed. Appx. 848, 849 (11th Cir. 2011)(citing Fed. R. Civ. P. 56(c)(1)(A), (e)(2)).  In resolving a summary judgment motion, "the evidence and all reasonable inferences from that evidence are viewed in the light most favorable to the nonmovant, but those inferences are drawn only to the extent supportable by the record." Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010)(citations and internal quotation marks omitted).

## EVIDENTIARY ISSUES

### McLendon's Affidavit

The court imposed a deadline of June 3, 2013 for filing dispositive motions. (Doc. # 38).  In support of the motion they filed on that date, defendants contemporaneously filed, *inter alia*, a signed – but unsworn – statement from defendant McLendon (Doc. # 43-9). Three days later, defendants moved to substitute McLendon's sworn affidavit.  (Doc. # 46). Although McLendon had signed the statement before the motion was filed, defense counsel explained that McLendon was unavailable to have it notarized in time for filing with the motion.  (Id.).  However, the affidavit filed with the motion bore an attestation date of May 28, 2013, six days before the summary judgment motion was filed.  (Doc. # 46-1).  After the court sought an explanation for the discrepancy from defense counsel (Doc. # 47), he explained – attaching a declaration from the notary, the office manager for the Russell County Sheriff – that McLendon executed the affidavit on June 4, 2013, but the notary had misdated her attestation for May 28, 2013 (Doc. # 48, 48-1).[2] Defendants moved to substitute a replacement affidavit for McLendon, notarized on June 18, 2013, for the misdated affidavit filed on June 6, 2013 (Doc. # 48, p. 5; Doc. # 48-2).  In view of the notary's declaration, the court will consider the affidavit executed on June 18, 2013 (Doc. # 48-2) on the present motion.[3]

_____

[2] Defense counsel acknowledged that he should have caught the error before he filed the document.  (Doc. # 48).

[3] Except for a new signature and notary attestation, the June 18, 2013, affidavit is identical to McLendon's unsworn statement filed with the summary judgment motion. In its order requiring an explanation from defense counsel, the court advised plaintiff "to respond to the pending motion for summary judgment as though McLendon's unsworn statement is competent evidence that the court may consider on the motion" and, further, noted the court's intention to take the motion for summary

**Videos**

On the date that summary judgment motions were due, defendants also filed a "Notice of Conventionally Filing Exhibits" advising the court that Exhibits A through D were videos "on DVD format that have been mailed via United States Postal Service, first class postage prepaid to *Pro* Se Plaintiff, and to the Clerk of the Middle District." (Doc. # 44)(italics as in original). When the DVDs failed to arrive in the court's mail, the docket clerk telephoned defense counsel's office. On June 24, 2013, defendants filed an "Amended Notice of Conventionally Filed Exhibits" (Doc. # 49), in which defense counsel states that he served the DVDs on plaintiff by first class mail on June 3, 2013, as indicated in his original notice, and hand-delivered a courtesy copy to chambers (which the undersigned has no record of receiving at that time). However, he also represents that the DVDs were hand-delivered to the Clerk with the amended notice – *i.e.*, on June 24, 2013. Defendants do not now contend that they mailed a set of the DVDs to the court by first class mail on June 3, 2013, as represented in their original notice (Doc. # 44), and offer no cause – good or otherwise – for their three-week delay in filing the DVDs. (See Doc. # 49). As a result of the delay, the video evidence was presented to the Clerk on the very day on which plaintiff's response to the summary judgment motion was due. (See Doc. # 45). Defense counsel does not explain how he knows that the DVDs were mailed to plaintiff on June 3, 2013, when it appears that

---

judgment under submission as previously scheduled whether or not it allowed defendants to substitute McLendon's affidavit.  (Doc. # 45).  Thus, the court has not offered plaintiff a second opportunity to respond to the testimony presented in McLendon's affidavit.

the DVDs that counsel apparently intended to send to the Clerk on the same day were never mailed.  Upon review of the docket, the court cannot conclude with confidence that defense counsel mailed a set of the DVDs to plaintiff by first class mail on June 3, 2013.  Because it is not clear that plaintiff received the DVDs in a timely manner, and because defendants have not sought leave of the court for the untimely filing of the evidence into the record, the court declines to consider the videos designated as defendants' Exhibits A through D.

### Unsworn Interview Transcripts

Defendants have filed transcriptions of recordings of interviews conducted by an investigator for the Russell County Sheriff's Office of various witnesses – Towne, Hodges, and Renfroe – appending them to the affidavits of the witnesses.  However, the affidavits do not reference the interview transcripts.  Thus, the witnesses have not, under oath, adopted or incorporated their previous statements as reflected in the transcriptions of the recorded interviews.  The transcriptions are not competent evidence on the present motion, and the court has not considered them.  (See Doc. # 43-5 (Towne aff.) and Doc. # 43-6 (transcribed interview); Doc. # 43-12 (Hodges aff. at pp. 2-3 and transcribed interview at pp. 5-12); Doc. # 43-13 (Renfroe aff. at pp. 2-4 and transcribed interview at pp. 5-13)).

### Remaining Evidence

Rule 56 requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... *citing to particular parts of materials* in the record," Fed. R. Civ. P. 56(c)(1)(A)(emphasis added), by "showing that the materials cited do not establish

the absence or presence of a genuine dispute," Fed. R. Civ. P. 56(c)(1)(B), or by showing

"that an adverse party cannot produce admissible evidence to support the fact," <u>id</u>..

Defendants' summary judgment brief cites those portions of the evidence of record that

defendants contend satisfy their burden on summary judgment, as is required by Rule 56(c)

and this court's order.  (<u>See</u> Defendants' brief at pp. 4-10 (statement of facts); Doc. # 21, ¶

4 (Order stating, "Briefs must contain a statement of facts including specific references to

the record.  The court will not consider documents or parts of documents that have not been

specifically cited by page number.").  Plaintiff has not responded to the present motion and,

therefore, has not cited any evidence at all in opposition to the motion.[4]  Accordingly, in

determining whether defendants have satisfied their burden of showing that there is no

genuine dispute of material fact, the court has considered no evidence other than the

"particular parts of the materials of record" cited by defendants in their brief, including the

footnotes.  The court is not required to sift through the remainder of the record (including the

portions of plaintiff's deposition testimony not cited by defendants) in search of evidence that

might defeat the motion.  <u>See</u> Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited

materials, but it *may* consider other materials in the record.")(emphasis added); Fed. R. Civ.

P. 56(e)(2)("If a party ... fails to properly address another party's assertion of fact as required

by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion[.]");

_____

[4]  Plaintiff cannot claim ignorance of Rule 56's requirements for supporting factual positions on summary judgment, as the court quoted subparagraph (c)(1) of the rule – in its entirety – in its order of June 4, 2013.  (Doc. # 45).

Daughtry v. Army Fleet Support, LLC, 925 F.Supp.2d 1277, 1284 (M.D. Ala. 2013)(declining to "scour [plaintiff's] ... evidentiary submission, unguided by [plaintiff] himself, for possible supporting evidence")(citing Fed. R. Civ. P. 56(c)(1)(A), (c)(3)).

This is not to say that the court accepts all the facts as set forth by defendants in their brief. In some instances, defendants have made statements of fact without citing evidence of record,[5] and cited portions of plaintiff's deposition that do not constitute competent evidence of the facts for which they are cited.[6] They have also included facts that – while supported by evidence – are shown by other cited evidence to be in dispute.[7] Thus, in resolving the present motion, the court has considered the underlying evidence cited by defendant, except for the evidence the court has excluded expressly above and except for

---

[5] See, e.g., Doc. # 42 at p. 5 of 28, n. 2 (citing a web address) and n. 3 (including no citation).

[6] See, e.g., Doc. # 42 at p. 5 of 28, Fact # 9 ("Renfroe states that Plaintiff called him stating that she was lost and had struck a pine tree. When he arrived they began to argue about leaving her vehicle in the parking lot.")(citing plaintiff's deposition at p. 167, lines 7-22 and Renfro affidavit); Renfroe aff. at ¶ 3 ("She ... called me after about two hours. She told me she had taken a bunch of Xanax and had wrecked her car. I found her at Walgreens in Phenix City."); Plaintiff's depo. at p. 167, lines 7-22 (consisting of defense counsel reading a portion of the investigator's transcribed interview of Renfroe and plaintiff's response ("Uh-huh") to the question, "So they are setting the scene now at this time that you were over there, correct?"); see also Doc. # 42 at p. 6 of 28, Fact # 15 (relying on defense counsel's question during the deposition rather than plaintiff's testimony).

[7] See, e.g., Doc. # 42 at p. 8 of 28, Fact # 31 (setting forth Hodges' account of her altercation with plaintiff, describing plaintiff as the aggressor, relying on Hodges' affidavit (and the inadmissible transcript of the recording of her interview by the investigator)); id. at p. 8 of 28 n. 5 (citing plaintiff's depo., p. 137, lines 14-18 (plaintiff's affirmative response to the question, "Now, your testimony is that she [the other inmate] attacked you for no reason; is that correct?").

affidavit testimony that is inadmissible hearsay, conclusory, or speculative.[8] It has resolved

any conflicts and drawn reasonable inferences from the evidence in plaintiff's favor.

## UNDISPUTED FACTS[9]

On the afternoon of November 14, 2010, plaintiff was at home with her five children

and her boyfriend, Bradley Renfroe, after attending church.  Because it was the Sunday after

Veterans Day, and "they were talking about veterans" at church, plaintiff was very emotional;

she was yelling and cursing.  She took several Xanax pills which, at first, had no effect on

her. Plaintiff got into her car and left to purchase alcohol.  Because neither Harris County nor

Columbus sold alcohol on Sundays, she drove to Phenix City. Once she arrived in Phenix

---

[8]  For example, McLendon's affidavit includes a statement regarding the charges for which Towne arrested the plaintiff, and why Chambers used chemical spray and a baton on the plaintiff while Freeman and Chambers were trying to change plaintiff into an inmate uniform, when there is no indication in the testimony that he witnessed either incident. The witness affidavits include conclusory statements such as "Ms. Hoover was extremely abusive and violent to the officers and inmates ...." (Towne aff., ¶ 12; Freeman aff., ¶ 9; Chambers aff., ¶ 10; McLendon aff., ¶ 13) and "She was extremely abusive, exhibited violent behavior, and was verbally disrespectful ..." (Pelfrey aff., ¶ 4).  Renfroe, who was not present at the jail or when plaintiff was arrested, testifies that he "believe[s] that [plaintiff] was combative and was probably resisting arrest." (Renfroe aff., ¶ 6).  The court has limited its consideration to the non-hearsay evidence of specific facts describing the events giving rise to plaintiff's claims, rather than the speculation of witnesses or the conclusory labels witnesses have assigned to those facts.  Additionally, although defendants have failed to authenticate the medical records at Defendants' Exhibits M, N, O, and P, plaintiff has lodged no objection to their authenticity. Thus, the court finds that plaintiff has waived any such objection. Cf. Auto Drive-Away Co. of Hialeah, Inc. v. I.C.C., 360 F.2d 446 (5th Cir. 1966)(objection to unsworn exhibits attached to summary judgment affidavit waived on appeal by failure to object in district court). Assuming their authenticity, such documents are not objectionable on the basis of the hearsay rule. See Fed. R. Evid. 803(4), 803(6); see also Fed. R. Evid. 902(11).

[9]  See Affidavits of Towne, Freeman, Chambers, McLendon, Pelfrey, Hodges, and Renfroe; specific portions of Plaintiff's deposition testimony cited by defendants in their brief in support of summary judgment.

City, she suddenly had no idea where she was or what she was doing.  Plaintiff pulled over at a drugstore and called Renfroe; she told him that she did not know what to do.  Plaintiff told Renfroe the name of the businesses around her and the street names she saw on the street signs.  She then sat in her car and waited until he arrived.  When Renfroe approached her car, he was angry.  A woman walked out of the store with her children and heard Renfroe yelling at plaintiff.  The woman yelled, "I am a police officer and you are disturbing the peace." Renfroe then told plaintiff, "[l]et's go." However, plaintiff was not in a "good frame of mind" and Renfroe left without her. The woman then told plaintiff, "[W]e can't arrest you sitting here ... leave, go."  Plaintiff did so.

Immediately after plaintiff pulled out of the drugstore driveway, police officer Christine Pressley pulled her over. Officer Jason Towne of the Dadeville Police Department[10] then arrived on the scene; he observed that plaintiff was unsteady on her feet, her hair was in disarray, and she was uttering vulgarities. Plaintiff failed the field sobriety tests administered by Towne, and he and Pressley arrested plaintiff for driving under the influence of a controlled substance. Towne transported plaintiff to the Russell County jail without further incident.  He put her into a holding cell with Keri Hodges, a detainee whom Towne had arrested earlier that day.  Towne saw that Hodges was lying on the bench, covered with a blanket. Hodges then attacked plaintiff for no reason. Towne was in the process of completing paperwork; he heard a commotion coming from the holding cell and saw plaintiff

---

[10]  Towne avers that he is "currently, and was at the time of the incident made the basis of the Plaintiff's Complaint, employed by the Dadeville Police Department."  (Towne aff., ¶ 2).

hitting Hodges. Towne went into the holding cell with Officers Kathleen Freeman and Shannon Chambers, employees of the Russell County Sheriff's Department, to separate plaintiff and Hodges. Plaintiff refused to let go of Hodges, despite several orders to do so, and Chambers "administered one quick burst of Freeze + P chemical spray" to force plaintiff to release Hodges. Towne handcuffed plaintiff, and left her in the female intake area.

Plaintiff was then escorted into the booking area so that Towne could administer the Drager blood alcohol test. Because of plaintiff's earlier behavior, Sergeant McLendon – a corrections officer with the Russell County Sheriff's Office – "stood by" in the booking area. Towne removed his handcuffs from plaintiff's wrists, and she began uttering profanity at the officers, including racial slurs directed at Chambers and Freeman. McLendon told plaintiff to sit down on a bench. Plaintiff made repeated attempts to stand and, each time, McLendon pushed her back down on the bench. The last time she attempted to stand, McLendon pushed her onto the bench and held her down. He told her that if she did not cooperate, he would put her back in restraints. Plaintiff then kicked McLendon in the thigh and hit him in the cheek with her fist. McLendon "executed a brachial stun" and put plaintiff on the floor to restrain her. Chambers and Towne came to assist. The officers handcuffed plaintiff again and put her back on the bench, ordering her to stay there. Chambers had to restrain plaintiff physically on the bench, and plaintiff kicked Chambers in the abdominal area. Chambers used another "quick burst of Freeze + P chemical spray to subdue plaintiff and end the

assault.  Chambers and Freeman took plaintiff from the booking room to a holding cell.[11]
Towne completed his paperwork and left the jail.

McLendon, the supervisor, instructed Chambers and Freeman to remove plaintiff's
clothing and have her put on an inmate uniform.  Plaintiff did not cooperate.  She walked
toward the two officers in what they perceived as a "hostile" manner.  They told her, several
times, to sit down.  She disregarded their instructions, and Chambers administered the Freeze
+ P spray.  Plaintiff began kicking Chambers and pulling Freeman's hair.  Freeman applied
pressure to plaintiff's right arm and wrist to gain control, but plaintiff continued to fight.
Chambers then struck plaintiff's left leg twice with her baton. The two officers forced
plaintiff down on the bed and removed her clothing.  Plaintiff refused to put on the inmate
uniform.  She "was instructed to 'stay back until [Freeman and Chambers] exited the holding
cell.'"  The jail staff covered a window with paper thereafter to obstruct the view of male
inmates, and they also set up an observation log.

At approximately 4:30 a.m. the next morning, McLendon and Freeman responded to
a report that plaintiff was trying to kill herself.  They saw that she had tied one leg of the
uniform pants to the air vent and the other leg around her neck.  Plaintiff had taken weight
off her legs, but the pants had broken away from the air vent.  Freeman entered the cell and
retrieved the jail uniform. She saw no visible injuries on or around plaintiff's neck, and
plaintiff did not appear to Freeman to be injured.  At 8:10 a.m., plaintiff was taken to the

---

[11]  Towne describes the two officers who took plaintiff from the booking room to the cell as
"female officers."  (Towne aff., ¶ 10).

medical unit of the jail. She used profanity to the staff, including the staff nurse, the physicians, and the officers who were present. At the physician's direction, the nurse gave plaintiff a Haldol shot to calm her down.

Renfroe saw plaintiff the day after she was released from jail. He observed bruises on her back but does not recall seeing any bruises or swelling on plaintiff's face. Late in the evening on November 16, 2010, plaintiff sought treatment at the St. Francis Hospital for complaints of anxiety, depression, stress, and PTSD. The physician diagnosed an exacerbation of PTSD, prescribed Ambien and Naprosyn, and referred plaintiff to "New Horizon" for follow-up treatment. Plaintiff returned to the emergency room just after 11:00 p.m. on November 19, 2010, three days after her previous visit. She reported that she "was arrested [and] had [a] tranquilizer shot in her left hip and has had pain since[.]" She complained of left-sided back pain and right wrist pain. An x-ray of her right wrist revealed "a healing fracture within the distal diaphysis of the ulna with callus formation[,]" "no acute fractures[,]" and intact wrist alignment. The examining physician assessed a right wrist fracture, acute myofascial lumbar strain, and "multiple contusions to legs, arms, face[.]" He prescribed medications and a wrist splint, and discharged plaintiff home in stable condition just after midnight.

## DISCUSSION

Plaintiff alleges that defendants have violated her rights under the "Fourth and Fourteenth Amendments to the Constitution of the United States." (Complaint, ¶ 1).

Defendants contend that they are entitled to qualified immunity on plaintiff's claims.

## Discretionary Authority

To establish their entitlement to qualified immunity, defendants bear the burden of establishing that they were acting within the scope of their discretionary authority when they committed the allegedly unconstitutional acts. Harbert International, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998). To do so, each defendant must show that his or her actions were: "(1) undertaken pursuant to the performance of his [or her] duties, and (2) within the scope of his [or her] authority." Id. at 1282. At the summary judgment stage, a defendant must make that showing "by competent summary judgment materials of objective circumstances that would compel [the] conclusion" that the defendant took the complained of action in performing his or her duties, and that the action was within the scope of his or her authority. Id. (quoting Barker v. Norman, 651 F.2d 1107, 1124-25 (5th Cir. Unit A July 30, 1981)). The proper inquiry is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties. The scope of immunity should be determined by the relation of the [injury] complained of to the duties entrusted to the officer." Id. (citations and internal quotation marks omitted; alteration in Harbert); see also Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)(phrasing the inquiry as "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize.").

13

Defendants acknowledge that they bear the burden on the issue of whether they were acting within their discretionary authority. (Doc. # 42, p. 23-24). However, defendants do not meet that burden directly by pointing to the "competent summary judgment materials" of record that demonstrate that each defendants' duties included supervising and maintaining control of inmates at the Russell County jail. Instead, they note that their burden involves a "low hurdle," Id. at. p. 24 (citation omitted). Next, they frame the issue in a manner that presupposes the answer, as follows: "So, the question is 'what is the act complained of' in the instant case *that gives the Defendants discretionary authority*? The 'act complained of' is that they employed excessive force against Plaintiff *while acting as Correctional Officers* at the Russell County Jail." (Id.)(emphases added). Without discussing the evidence that they contend satisfies their burden, defendants conclude, "Obviously, the Defendants were acting, then, within the scope of their duties and within their discretionary authority and, thus, clear this low hurdle." (Id.).

Defendants' burden is, as they themselves argue, not difficult to meet. It is, nonetheless, an evidentiary burden that defendants must satisfy by pointing to competent summary judgment evidence. Harbert, 157 F.3d at 1282; Fed. R. Civ. P. 56(c)(1). The "acts complained of" are the uses of force and the deprivation of clothing during plaintiff's detention. To shift the burden of proof to plaintiff on their qualified immunity defense, defendants must affirmatively show that supervising detainees at the Russell County Jail was within the scope of each defendant's duties, and that the means they employed were within

their authority.  Harbert, 157 F.3d at 1281 ("To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority.  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law.")(citation omitted).

While it would have been a simple matter for defendants to address the scope of their duties and authority expressly in their affidavits, they have failed to do so.  Accordingly, the court must itself sift through the evidence defendants have cited on the present motion to determine whether it is sufficient to satisfy their burden on their qualified immunity defense. All three defendants state that, at the time of the incidents at issue, they were employed by the "Russell County Sheriff's Department." (McLendon aff., ¶ 2; Freeman aff., ¶ 2; Chambers aff., ¶ 2).  McLendon adds that he was "employed ... as a corrections officer, with the rank of Sergeant[.]" (McLendon aff., ¶ 2).  Chambers and Freeman refer to each other by the title "Officer," and McLendon also uses that title in referring to both Chambers and Freeman.  (Chambers aff.; Freeman aff.; McLendon aff.).  Freeman testifies that she and Chambers "were instructed by the supervisor to remove Hoover's clothing and have her put on a blue jumper" (Freeman aff., ¶ 6); Chambers testifies that she and Freeman were instructed to do so by McLendon (Chambers aff., ¶ 8). While this evidence is sparse, the court concludes that it is just barely sufficient – viewed in the context of the governing law – to satisfy each defendants' burden. Under Alabama law, the county sheriff bears the

responsibility for controlling and protecting the inmates in the county jail and for supervising and directing those he or she employs to carry out that responsibility. Ala. Code §§ 14-6-1, *et. seq.*; see Turquitt v. Jefferson County, Ala., 137 F.3d 1285 (11th Cir. 1998)("Under the Alabama Code, the sheriff has control over the inmates of the jail, the employees of the jail, and the jail itself. ... The sheriff appoints, directs, and controls the deputies and jailers who work at the jail."). McLendon is a "corrections officer" employed by the sheriff and, on the shift in question, both Chambers and Freeman were officers working at the jail under his supervision. This evidence is sufficient to demonstrate that – at the time of their encounters with the plaintiff – all three defendants had job duties that included controlling and protecting inmates at the jail. In view of these duties, the means they employed (use of pepper spray and a baton, applying physical force, and removing the uniform from an inmate's cell) – "examined on a general level rather than in this specific application – were legitimate prerogatives of [their] jobs." Holloman, 370 F.3d at 1267. In other words, when defendants performed these acts, they were "exercising powers that legitimately form a part of their jobs." Id. at 1266-67; see also Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004)("To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.' That is easy here. Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby.")(quoting Holloman, 370 F.3d at 1265).

Because defendants have met their burden – albeit by a slim margin – of showing that they were acting within the scope of their discretionary authority,[12] the burden of proof shifts to plaintiff to establish that the defendants are not entitled to qualified immunity.  Skop v. City of Atlanta, Georgia, 485 F.3d 1130, 1136-37 (11th Cir. 2007).  To do so, plaintiff must show that defendants' conduct violated a clearly established constitutional right.  Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009).

### The Source of Plaintiff's Rights

Plaintiff claims that defendant violated her rights protected by the Fourth and Fourteenth Amendments. (Complaint, ¶¶ 1, 45). She maintains that, "[p]ursuant to the Fourth and Fourteenth Amendments to the Constitution of the United States, [she] has a right to be free from the use of unreasonable and excessive force and a right to bodily integrity, respectively." (Id., ¶ 51).  Defendants do not respond to plaintiff's allegation that the Fourth Amendment is a source of her allegedly infringed right "to be free from the use of unreasonable and excessive force[,]" nor do they acknowledge her claim to "a right to bodily integrity" under the Fourteenth Amendment. They argue only that their conduct does not violate the excessive force standard applicable to pretrial detainees under the Fourteenth Amendment.

Upon its review of Eleventh Circuit case law, the court concludes that the Fourth Amendment does not govern plaintiff's excessive force claim.  Plaintiff makes no allegation

---

[12]  Plaintiff does not allege that the defendants were not acting within the scope of their discretionary authority (see Complaint), and has not opposed the present motion.

of improper conduct occurring before her altercation with Hodges in the holding cell.  Thus, under the law of this circuit, the right to be free from excessive force in the present case arises under the due process clause of the Fourteenth Amendment.  See Fennell, 559 F.3d at 1215 n. 4 (claim of excessive force during a "pat-down" search immediately following the plaintiff's arrival at the jail, in the presence of the arresting officer, was "governed by the Fourteenth Amendment"); Cottrell v. Caldwell, 85 F.3d 1480, 1483, 1490 (11th Cir. 1996)(applying Fourteenth Amendment standard to a claim of mistreatment of plaintiff's decedent as he was "being transported in the back of a police car after his arrest[;]" stating, "Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners."); but see Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008)(assuming that the Fourth Amendment governs a claim challenging a policy or practice of strip-searching arrestees "as a part of the process of booking them into the general population of a detention facility"); Hicks v. Moore, 422 F.3d 1246, 1253 n. 7 (11th Cir. 2005)(assuming – in a case decided nine years after Cottrell and in the absence of contrary argument by the defendants – that plaintiff was "still being seized" during the booking process at the jail, after the arresting officer had turned her over to the jailers, so that the Fourth Amendment "objective reasonableness" standard governed her claims of mistreatment).

　　As to plaintiff's claimed right to bodily integrity, the Eleventh Circuit has recognized

that inmates "retain certain fundamental rights of privacy[,]" including a "constitutional right to bodily privacy." Fortner v. Thomas, 983 F.2d 1024, 1029-30 (11th Cir. 1993)(internal quotation marks and citations omitted). "The United States Constitution does not expressly guarantee a right to privacy, but the Supreme Court has held that a right to privacy does exist within the liberty component of the Fourteenth Amendment." Padgett v. Donald, 401 F.3d 1273, 1280 (11th Cir. 2005).[13] Plaintiff's allegations of being forced to remain naked in her cell while McLendon and others "peer[ed]" at her implicates her right to bodily privacy and, therefore, also arises under the due process clause of the Fourteenth Amendment. To the extent that she challenges her conditions of confinement on the basis of her forced nudity, this claim also arises under the Fourteenth Amendment. Wilson v. Blankenship, 163 F.3d 1284, 1291 (11th Cir.1998)(a pretrial detainee's claim about confinement conditions is analyzed under the Due Process Clause of the Fourteenth Amendment).

### Excessive Force

The Eleventh Circuit has summarized the law applicable to plaintiff's "excessive force" claims as follows:

> The Due Process Clause of the Fourteenth Amendment protects pretrial detainees, like [plaintiff], from the use of force that "shocks the conscience," which is force that is applied "maliciously and sadistically for the very purpose of causing harm." Danley v. Allen, 540 F.3d 1298, 1306–07 (11th Cir. 2008), *overruled on other grounds by* Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

---

[13]   The Padgett court observed that "Fortner's holding ... comports with the Supreme Court's recognition that people have a protected privacy interest in avoiding disclosure of certain personal matters – there, the exposure of their naked bodies." Padgett, 401 F.3d at 1281.

* * * * *

In Eighth and Fourteenth Amendment excessive force cases, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, __ U.S. __, 130 S.Ct. 1175, 1178, 175 L.Ed.2d 995 (2010)(quotation marks omitted). In determining whether the force was applied maliciously and sadistically to cause harm, courts consider several factors, including: "a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response." Fennell, 559 F.3d at 1217. We consider these factors "as reasonably perceived by" the correctional officer based on the facts known to him at the time and "give a wide range of deference to prison officials acting to preserve discipline and security." Id. (quotation marks omitted in second quotation). Nonetheless, deference to correctional officers is not absolute and does not insulate from review actions taken in bad faith or for no legitimate purpose. Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987).

Skelly v. Okaloosa County Board of County Commissioners, 456 Fed. Appx. 845, 847-848 (11th Cir. 2012)(footnotes omitted).  "A jailor's use of force against a pretrial detainee is excessive under the Fourteenth Amendment if it 'shocks the conscience.'  The use of force does not 'shock the conscience' if it is applied 'in a good faith effort to maintain or restore discipline.'" Fennell, 559 F.3d at 1217 (citations omitted). Due to the nature of the subjective intent required to prove a Fourteenth Amendment excessive force claim – i.e., that the defendant applied the force maliciously and sadistically to cause harm – any conduct sufficient to establish such a claim violates a "clearly established" constitutional right. Johnson v. Breeden, 280 F.3d 1308, 1321-22 (11th Cir.2002)("[W]here this type of [Eighth Amendment excessive force] constitutional violation is established there is no room for

20

qualified immunity.  It is not just that this constitutional tort involves a subjective element, it is that the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution[.]").

Viewed in light of the relevant factors, the evidence before the court on the present motion – viewed in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor – does not permit a reasonable conclusion that any defendant either used force "maliciously and sadistically to cause harm" (Wilkins, 130 S.Ct. 1178), or failed in his or her duty to intervene as another defendant did so.  As set forth above, the actions giving rise to plaintiff's excessive force claims occurred as follows:

1.  Use of force in the holding cell.  The first application of force occurred when Towne, Freeman, and Chambers went into the holding cell to separate Hodges and plaintiff. While Hodges had instigated the fight, what Towne saw was plaintiff hitting Hodges.  After plaintiff refused to obey several orders to let go of Hodges, Chambers sprayed her with "one quick burst" of chemical spray, and Towne handcuffed her.  In view of plaintiff's failure to obey orders to release Hodges, the use of some degree of force was necessary to protect Hodges and restore discipline. Chambers' minimal use of force – *i.e.*, a single burst of chemical spray – enabled the officers to bring the situation under control without the need for a more forceful response.  The evidence before the court on the present motion does not permit a reasonable conclusion that Chambers used the chemical spray other than in a good

faith attempt to restore discipline. <u>See</u> <u>Scroggins v. Davis</u>, 346 Fed. Appx. 504 (11th Cir. 2009)(use of one burst of pepper spray on an inmate who disobeyed a direct order and made an aggressive move toward a guard was not excessive force).[14, 15]

2. <u>First use of force in the booking room</u>. McLendon testifies that he "stood by" in the booking room due to plaintiff's previous behavior. He told plaintiff to sit down on the bench, but she repeatedly tried to stand. He pushed her back down on the bench each time and, on the last such occasion, held her down on the bench and told her that he would put her back in restraints if she did not cooperate. Plaintiff kicked him in the leg and struck his cheek with her closed fist; he executed a brachial stun blow and put her down on the floor to restrain her. Chambers came to assist him in restraining the plaintiff. The officers handcuffed plaintiff again. In this instance, the use of force was necessitated by plaintiff's refusal to remain seated, despite multiple orders to do so, and by her assault on McLendon. It appears from plaintiff's medical record that she suffered bruising to the right side of her neck, bruising elsewhere on her body and, possibly, a fractured wrist[16] that may have resulted

---

[14]   The evidence before the court on the present motion does not demonstrate that defendants acted (or failed to act) "maliciously and sadistically" to cause further discomfort from the effects of the spray, as in <u>Nasseri v. City of Athens, Alabama</u>, 373 Fed. Appx. 15 (11th Cir. 2010) or <u>Danley v. Allen</u>, 540 F.3d 1298 (11th Cir. 2008), nor does it demonstrate that plaintiff suffered any injury as a result of the spray.

[15]   While the court has evaluated this use of chemical spray under the five factors set forth in <u>Whitley v. Albers</u>, 475 U.S. 312 (1986) to determine whether it "shocks the conscience," the court notes that plaintiff does not allege it as a basis for her claim. <u>See</u> Complaint, Doc. # 1, ¶¶ 15-16.

[16]   The evidence before the court on the present motion does not suggest that plaintiff complained of wrist pain when she was taken to the jail's medical unit. Plaintiff did not seek treatment for her

from her scuffle with McLendon.[17]  Even assuming that all of the injuries documented in the record were a result of this incident, plaintiff has failed to show that any defendant exerted more force than was necessary to restrain the plaintiff, let alone that any of the defendants applied force maliciously and sadistically for the purpose of inflicting harm.

3.  <u>Second use of force in the booking room</u>.  The officers put plaintiff back on the bench and ordered her to stay there.  Chambers physically restrained plaintiff on the bench, and plaintiff kicked her in the stomach.  Chambers used another "quick burst" of chemical spray. As with Chambers' first use of chemical spray, the evidence does not permit a reasonable conclusion that the use was excessive, in view of plaintiff's assault on Chambers. The use of chemical spray to gain control of the plaintiff under the circumstances presented by the summary judgment evidence does not violate the Fourteenth Amendment. <u>See</u> <u>Scroggins</u>, *supra*.

4.  <u>Use of force in undressing the plaintiff.</u>  Plaintiff refused to change into the inmate uniform.  She walked toward Chambers and Freeman, and disregarded several orders to sit

---

wrist the first time she went to the emergency room after her release and the physician indicated by checkmarks on the physical examination form that her extremities were "non-tender," with normal range of motion, no edema and "no signs of injury." (Defendants' Exhibit M, Doc. # 43-14, p. 5 of 14). The wrist x-ray performed on plaintiff's ER visit three days thereafter showed "a healing fracture ... with callus formation" and "no acute fractures[.]" (Defendants' Exhibit P, Doc. # 43-17, p. 8 of 15).

[17]  The court assumes, for purposes of the present motion, that the injuries documented in plaintiff's medical record resulted from defendants' actions at the jail. There is no evidence permitting any conclusion regarding whether plaintiff's injuries resulted from her altercation with Hodges, the booking room incident involving McLendon, or the incident in the cell when Chambers and Freeman removed plaintiff's clothing.

down.  Chambers sprayed plaintiff with chemical spray.  Plaintiff began kicking Chambers and pulling Freeman's hair.  Freeman applied pressure to plaintiff's right arm and wrist to gain control, but plaintiff continued to fight.  Chambers then struck plaintiff's left leg twice with her baton.  The officers forced plaintiff down on the bed and removed her street clothing.  Plaintiff refused to wear the jail uniform.  The undisputed evidence demonstrates the need for the application of force in this instance and the fact that the safety of the officers was at risk – Chambers used the chemical spray on plaintiff as she advanced on them and disregarded several orders to sit down.  Neither officer exerted any physical force on plaintiff until plaintiff attacked them both.  Chambers resorted to use of her baton to strike plaintiff after plaintiff continued to fight despite Freeman's use of pressure on plaintiff's arm and wrist.  The injury inflicted on plaintiff does not demonstrate that the force used by the officers was excessive, in view of plaintiff's aggression and her repeated failure to comply with orders.  The evidence before the court on the present motion does not permit a reasonable conclusion that Freeman or Chambers applied force maliciously and sadistically to cause plaintiff harm.

### Right to Bodily Privacy

Within her excessive force claim, plaintiff complains of being left naked in her cell for several hours while McLendon, other officers, and inmates "peer[ed] at Plaintiff as if she were on display at a zoo!" (Complaint, ¶¶ 27-29, 50). Plaintiff asserts "a right to bodily integrity," in addition to her "right to be free from the use of unreasonable and excessive

force[.]" (Id., ¶ 51). Plaintiff's claim of being left naked for several hours does not relate to the use of force at all but, rather, to an alleged violation of her right to bodily privacy. In Boxer X v. Harris, 437 F.3d 1107 (11th Cir. 2006), a male prisoner complained that a guard of the opposite sex compelled him to masturbate while she watched. The district court dismissed the claim pursuant to 28 U.S.C. § 1915 for failure to state an Eighth Amendment claim. The Eleventh Circuit agreed that the plaintiff's allegations did not state an Eighth Amendment claim (id. at 1111) but reversed the judgment of dismissal, stating:

> We joined other circuits recognizing a prisoner's constitutional right to bodily privacy in Fortner v. Thomas, 983 F.2d 1024 (11th Cir. 1993). In Fortner, "female officers ... solicit[ed] ... [male prisoners] to masturbate and otherwise exhibit their genitals for the female officers' viewing." Id. at 1027. We held that this violated the prisoner's right to privacy. Id. at 1030. Fortner outlined a very narrow privacy right involving people's "'special sense of privacy in their genitals'" and noted that "'involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" Id. (citing Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981)). We have reaffirmed the privacy rights of prisoners emphasizing the harm of compelled nudity. See Padgett v. Donald, 401 F.3d 1273, 1281 (11th Cir. 2005).

Boxer X v. Harris, 437 F.3d at 1110-11. The Court further observed that it has, "[n]onetheless, ... 'continue[d] to approach the scope of the privacy right on a case-by-case basis.'" Id. at 1111 (quoting Fortner, 983 F.2d at 1030).

As noted above, to overcome defendants' qualified immunity defense, plaintiff must establish that defendants violated her clearly established constitutional right. Plaintiff may not do so by relying merely on the allegations of her complaint. See Fed. R. Civ. P. 56(c)(1). The evidence before the court on the present motion demonstrates that, after Chambers and

Freeman removed plaintiff's clothing and plaintiff refused to don the jail uniform, "[a]n observation log was set up to monitor [plaintiff], and paper was placed over the window to obstruct the view by male inmates." (McLendon aff., ¶ 9). Freeman removed plaintiff's inmate uniform from the cell later on, after she and McLendon – the supervisor on duty – responded to a report that plaintiff was trying to kill herself, and saw that plaintiff had attempted to hang herself from the air vent using the uniform pant legs. (McLendon aff., ¶ 12; Freeman aff., ¶ 8).

The Eleventh Circuit's bodily privacy cases cited above (Boxer X and Fortner) both involved factual scenarios much more egregious than that presented by the evidence in this case. See Boxer X, 437 F.3d at 1109 (male inmate complained that a female guard, "made him strip and masturbate for her enjoyment"); Fortner, 983 F.2d at 1027 ("The appellants claim that the female officers flirt, seduce, solicit, and aroused them to masturbate and otherwise exhibit their genitals for the female officers' viewing."). In this case, plaintiff cites no evidence that any male other than McLendon observed her while she was unclothed, that McLendon saw her naked at any time other than when he responded to her cell after receiving a report that she was trying to kill herself, or that McLendon behaved inappropriately when he saw her unclothed. Additionally, it is undisputed that plaintiff was naked of her own volition at the time that McLendon saw her. She had a jail uniform in her possession and, instead of wearing it, tried to hang herself with it. Plaintiff has failed to establish that, under clearly established law, McLendon's viewing plaintiff in the nude under

these circumstances violated plaintiff's constitutional right to bodily privacy.  See Letcher v. Turner, 968 F.2d 508, 510 (5th Cir. 1992)(finding no constitutional violation in female guard's presence during strip search of male prisoner "where a maximum show of force was required because of the earlier unruly behavior of the inmates"; endorsing the principle set forth in its earlier decision in Barnett v. Collins, 940 F.2d 1530 (5th Cir. 1991)(Table, No. 91-1038, unpublished), cert. denied 502 U.S. 1077 (1992), that "no constitutional violation occurs when naked male inmates a viewed by female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility").  Therefore, defendants are entitled to qualified immunity on plaintiff's claim that they violated her constitutional right to bodily privacy.

### Conditions of Confinement

Plaintiff's allegations of forced nudity during her detention may be read to challenge her conditions of confinement. "The Eighth Amendment's prohibition on conditions of confinement that amount to cruel and unusual punishment also applies to pre-trial detainees through the Fourteenth Amendment's due process clause." Bennett v. Chitwood, 519 Fed. Appx. 569, 573-75 (11th Cir. 2013)(citing Wilson v. Blankenship, 163 F.3d 1284, 1291 (11th Cir.1998) and Hamm v. DeKalb County, 774 F.2d 1567, 1573–74 (11th Cir.1985)). "In analyzing confinement conditions about which a pretrial detainee complains, a court must decide whether the detention officials intentionally imposed the restriction for a  punitive purpose or whether it is reasonably incidental to a legitimate government objective.  If a

restriction is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court may infer that the purpose of the government action is punishment." <u>Wilson</u>, 163 F.3d 1291-92.

As discussed above, it is undisputed that plaintiff chose not to wear the jail uniform until the point at which it was removed from her cell after she used it to try to hang herself from the air vent.  She cites no evidence of record demonstrating any injury resulting from the deprivation of clothing, nor does she indicate how long thereafter she remained without clothing. She cites no evidence that might give rise to a finding that defendants took plaintiff's jail uniform away to punish her rather than for the legitimate purpose of preventing her from harming herself with it.  Thus, to the extent plaintiff that challenges her conditions of confinement, she has failed to overcome the defendants' qualified immunity defense.

## CONCLUSION

For the reasons set forth above, it is

ORDERED that the Clerk is DIRECTED to correct the docket to identify: (1) defendant "Cathleen Freeman" by her actual name, Kathleen Freeman; and (2) defendant "Steve McClendon" by his actual name, James McLendon. It is further

ORDERED that defendants' June 6, 2013 motion to substitute the affidavit of James McLendon (Doc. # 46) is DENIED, but its June 18, 2013 motion to substitute McLendon's re-executed affidavit (Doc. # 48) is GRANTED. It is further

ORDERED that defendants' motion for summary judgment (Doc. # 41) is

GRANTED.  A separate judgment will be entered.

DONE, this 24th day of September, 2013.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE